578 F.2d 319
 11 ERC 1129, 188 U.S.App.D.C. 77, 8
Envtl. L. Rep. 20,164,
8 Envtl. L. Rep. 20,277
 ASARCO INCORPORATED, Newmont Mining Corporation, and Magma
Copper Company, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
SIERRA CLUB, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M.
Costle, Administrator, United States Environmental
Protection Agency, Respondents,
ASARCO Incorporated, et al., Intervenors.
 Nos. 76-1030 and 76-1037.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 11, 1977.
Decided Jan. 27, 1978.
Opinion Concurring in Part and Dissenting in Part Feb. 28, 1978.
 
 Petitions for Review of Regulations Promulgated by the Environmental Protection Agency.
 Ralph J. Moore, Jr., Washington, D. C., with whom Frederick C. Schafrick, Washington, D. C., and Robert E. Denham, Los Angeles, Cal., were on the brief, for petitioners in No. 76-1030 and intervenors in No. 76-1037.
 John D. Hoffman, San Francisco, Cal., with whom Ronald J. Wilson, Washington, D. C., was on the brief, for petitioner in No. 76-1037 and amicus curiae in No. 76-1030.
 William L. Want, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Washington, D. C., was on the brief, for respondents. Gerald K. Gleason, Atty., Environmental Protection Agency, Washington, D. C., also entered an appearance for respondents.
 Before WRIGHT, LEVENTHAL and MacKINNON, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 Concurring opinion filed by Circuit Judge LEVENTHAL.
 Circuit Judge MacKINNON filed an opinion concurring in part and dissenting in part on February 28, 1978.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 These cases involve challenges by ASARCO Incorporated, Newmont Mining Corporation, and Magma Copper Company (hereinafter referred to collectively as ASARCO) and the Sierra Club (Sierra)[1] to regulations issued by the Environmental Protection Agency (EPA).[2] The challenged provisions modify previous regulations implementing Section 111 of the Clean Air Act, 42 U.S.C. § 1857c-6 (1970 & Supp. V 1975), as amended, Pub.L.No. 95-95 § 109, 91 Stat. 685, 697-703 (1977), which mandates national emission standards for new stationary sources of air pollution, by introducing a limited form of what the parties call the "bubble concept."[3] This court has jurisdiction over these petitions under Section 307(b)(1) of the Act, 42 U.S.C. § 1857h-5(b)(1) (1970 & Supp. V 1975), as amended, Pub.L.No. 95-95 § 305, 91 Stat. 772-777.
 
 
 2
 * A. Section 111 and the "Bubble Concept"
 
 
 3
 The 1970 amendments to the Clean Air Act[4] were passed in reaction to the failure of the states to cooperate with the federal government in effectuating the stated purposes of the Act, especially the commitment "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Clean Air Act § 101(b)(1), 42 U.S.C. § 1857(b)(1) (1970). See generally W. Rogers, Environmental Law § 3.1 (1977). The 1970 changes were designed "to improve the quality of the nation's air," 84 Stat. 1676 (1970), by increasing the federal government's role in the battle against air pollution. Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). The amendments require the states to develop pollution control programs (State Implementation Plans or SIPs) that will keep the levels of given pollutants in the atmosphere below the National Ambient Air Quality Standards (NAAQSs) set by EPA. Clean Air Act §§ 109, 110, 42 U.S.C. §§ 1857c-4, 1857c-5 (1970 & Supp V 1975), as amended, Pub.L.No. 95-95 § 106-108, 91 Stat. 691-697.[5]
 
 
 4
 In addition, the 1970 amendments added Section 111, which is the focus of this litigation. This section directs EPA to set specific and rigorous limits on the amounts of pollutants that may be emitted from any "new source" of air pollution. The New Source Performance Standards (NSPSs) established under Section 111 are designed to force new sources to employ the best demonstrated systems of emission reduction.[6] Since the NSPSs are likely to be stricter than emission standards under State Implementation Plans, plant operators have an incentive to avoid application of the NSPSs.
 
 
 5
 The basic controversy in the cases before us concerns the determination of the units to which the NSPSs apply. Under the Act the NSPSs apply to "new sources." A "new source" is defined as "any stationary source, the construction or modification of which" begins after the NSPS covering that type of source is published. Section 111(a)(2), 42 U.S.C. § 1857c-6(a)(2) (1970) (emphasis added). Further statutory definitions explain the terms used in this one. A " 'stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant." Section 111(a) (3), 42 U.S.C. § 1857c-6(a)(3) (1970). A " 'modification' means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." Section 111(a)(4), 42 U.S.C. § 1857c-6(a)(4) (1970). The statute thus directs that the NSPSs are to apply to any building, structure, facility, or installation which emits or may emit any air pollutant and which is either (1) newly constructed or (2) physically or operationally changed in such a way that its emission of any air pollutant increases.[7]
 
 
 6
 The "bubble concept" is based on defining a stationary source as a combination of facilities, such as an entire plant, and applying the NSPSs only when a new plant is constructed or when an existing plant is physically or operationally changed in such a way that net emissions of any pollutant from the entire plant increase. If applied consistently, the bubble concept would allow the operator of an existing plant to avoid application of the strict NSPSs by offsetting any increase in pollution caused by a change in the plant (e.g., modification or replacement of an existing facility, or even addition of a new facility) against a decrease in pollution from other units within the plant as a whole.
 
 B. History of the EPA Regulations
 
 7
 EPA's original regulations interpreting Section 111, promulgated in 1971, repeated the statutory definitions of "stationary source" and "modification" almost word for word[8] and did not contain any version of the "bubble concept." See 36 Fed.Reg. 24877 (1971), codified at 40 C.F.R. §§ 60.2(d) & (h) (1975). EPA acknowledges in its brief that it originally "defined the term new source as 'an affected facility ' which in turn was defined as any apparatus to which a standard of performance is specifically applicable." Brief for EPA at 10 (emphasis added). Affected facilities, and thus new sources, were clearly not synonymous with entire plants. For example, the regulations setting the NSPSs for sources in portland cement plants identify the following "affected facilities" in such plants: "kiln, clinker cooler, raw mill system, finish mill system, raw mill dryer, raw material storage, clinker storage, finished product storage, conveyor transfer points, bagging and bulk loading and unloading systems." 40 C.F.R. § 60.60 (1975).[9]
 
 
 8
 The "bubble concept" appeared first in proposals from the nonferrous smelting industry and the Department of Commerce (DOC) beginning in December 1972.[10] The industry and DOC urged that a stationary source be defined as an entire plant so that no "modifications" of the source would occur unless the total emissions of some pollutant from the plant increased.
 
 
 9
 In response to industry proposals and demands from DOC, EPA prepared draft regulations in May and July 1974 "clarifying" the previous regulations.[11] EPA made some concessions to the industry in these drafts,[12] but did not accept the industry's position that an entire plant should be defined as a single source.[13] EPA continued to resist the bubble concept in meetings with industry representatives, DOC, and the Office of Management and Budget through August 1974. See JA 8-9, 30-34.
 
 
 10
 Then, in September 1974, the agency again revised its position, making further concessions and proposing new regulations incorporating a limited version of the bubble concept.[14] After an additional concession further extending the bubble concept in response to a submission by DOC,[15] the proposed regulations were adopted by EPA.[16]
 
 
 11
 The new regulations would classify an entire plant as a single stationary source by embellishing the statutory definition of a stationary source as follows:
 
 
 12
 "Stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant and which contains any one or combination of the following:
 
 
 13
 (1) Affected facilities.
 
 
 14
 (2) Existing facilities.
 
 
 15
 (3) Facilities of the type for which no standards have been promulgated in this part.
 
 
 16
 40 C.F.R. § 60.2(d) (1976) (emphasis added). The italicized language is not included in the statutory definition of "stationary source" ("any building, structure, facility, or installation which emits or may emit any air pollutant"), nor was it included in the prior regulations. See 40 C.F.R. § 60.2(d) (1975). Thus the present regulations, instead of limiting the definition of "stationary source" to one "facility" as the statute does, make it cover "any one or combination of" facilities.[17] The preamble to the new regulations makes it clear that the purpose of this change is to define a statutory source as an entire plant.[18]
 
 
 17
 Relying on this new definition of a statutory source, EPA applies the bubble concept to allow a plant operator who alters an existing facility in a way that increases its emissions to avoid application of the NSPSs by decreasing emissions from other facilities within the plant. The regulations provide that "(a) modification shall not be deemed to occur" unless the change in an existing facility results in a net increase in the emission of a pollutant from the whole "source."[19]
 
 
 18
 In spite of strong comments from the nonferrous smelting industry, represented here by ASARCO,[20] the new regulations do not consistently apply the bubble concept to treat an entire plant as a single stationary source. EPA continues to apply NSPSs to all newly constructed facilities, even when the emission increases from the new facilities are offset by emission decreases from other facilities in the same plant. Newly constructed facilities are thus treated as independent stationary sources. In order to draw a line defining when the bubble concept will be applied, the regulations classify any changes in existing facilities that cost more than a fixed percentage of the value of the changed facility as "reconstruction." 40 C.F.R. § 60.15 (1976). "Reconstructed" facilities, like new facilities, are subject to NSPSs regardless of whether emissions from the plant of which they are a part increase.
 
 
 19
 In its petition for review ASARCO argues that the bubble concept must be applied to allow emission increases from reconstruction and new construction to be offset. Sierra argues that the Act defines a "source" as an individual facility, as distinguished from a combination of facilities such as a plant, and that the bubble concept must therefore be rejected in toto. For the reasons stated below we agree with Sierra and remand to EPA for further proceedings consistent with this opinion.
 
 II
 A. Scope of Review
 
 20
 The proper scope for judicial review of EPA's regulations interpreting the Clean Air Act is defined in Section 10(e) of the Administrative Procedure Act, which requires a reviewing court to "decide all relevant questions of law, interpret * * * statutory provisions, and * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * in excess of statutory jurisdiction, authority, or limitations, or short of statutory right * * *." 5 U.S.C. § 706(2)(C) (1970). See Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 541 F.2d 1, 33-34 & n.71 (en banc ), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). To be sure, as EPA correctly points out, the Supreme Court and this court have both stated that EPA's interpretation of the Clean Air Act is to be given considerable deference.[21] Nevertheless, it is clear that a reviewing court has the responsibility to examine carefully the words of the statute, the legislative history, and the reasons advanced by the agency to justify its interpretation in order to determine whether the agency's interpretation is "sufficiently reasonable that it should (be) accepted by the reviewing courts." Train v. Natural Resources Defense Council, Inc., supra,421 U.S. at 75, 95 S.Ct. at 1480.[22] Indeed, a panel of this court has recently rejected EPA's interpretation of another provision of the Clean Air Act. Lubrizol Corp. v. EPA, 183 U.S.App.D.C. 288, 562 F.2d 807 (1977) (finding that even the agency's persuasive policy arguments were inadequate to extend the commonly accepted meaning of the word "fuel" to include "motor oil" in the absence of any significant support for such an extension in the Act's legislative history). See also Ass'n of American Railroads v. Costle, 183 U.S.App.D.C. 362, 562 F.2d 1310 (1977) (rejecting the EPA Administrator's contention that the Noise Control Act of 1972 allowed him discretion not to issue federal noise standards for certain "equipment and facilities" on railroads).
 
 
 21
 Following the approach defined by these precedents, we first consider the challenge to the regulations raised by the Sierra Club, and then dispose of the challenge raised by ASARCO.
 
 B. Sierra's Challenge to the Regulations
 
 22
 The Sierra Club's basic contention is that the new regulations are inconsistent with the plain language of Section 111. The statute defines a stationary source as "any building, structure, facility, or installation which emits or may emit any air pollutant." Section 111(a)(3), 42 U.S.C. § 1857c-6(a)(3) (1970) (emphasis added). In contrast, the new regulations define stationary source to include "any * * * combination of * * * facilities * * *." 40 C.F.R. § 60.2(d) (1976) (emphasis added).
 
 
 23
 This change in the definition of a stationary source is essential to EPA's adoption of the bubble concept. By treating a combination of facilities as a single source, the regulations allow a facility whose emissions are increased by alterations to avoid complying with the applicable NSPS as long as emission decreases from other facilities within the same "source" cancel out the increase from the altered facility.[23] Sierra argues forcefully that this result is incompatible with the statute's mandate that NSPSs should be applied to "any structure, building, facility, or installation" that undergoes "any physical change * * * or * * * change in the method of operation * * * which increases the amount of any air pollutant emitted by such (structure, building, facility, or installation)." 42 U.S.C. §§ 1857c-6(a)(3), 1857c-6(a)(4) (1970) (emphasis added). See brief for petitioner Sierra Club at 25-33.
 
 
 24
 EPA responds that the "broad" statutory definition of stationary source gives it "discretion" to define a stationary source as either a single facility or a combination of facilities. Brief for EPA at 13-16. We find this response unpersuasive.[24] The regulations plainly indicate that EPA has attempted to change the basic unit to which the NSPSs apply from a single building, structure, facility, or installation the unit prescribed in the statute to a combination of such units. The agency has no authority to rewrite the statute in this fashion. See, e. g., Ass'n of American Railroads v. Costle, supra; Lubrizol Corp. v. EPA, supra.
 
 
 25
 Our conclusion that the regulations incorporating the bubble concept must be rejected as inconsistent with the language of the Act is reinforced when we consider the purpose of the Clean Air Act and Section 111, the confusion generated by the present regulations, and the weakness of EPA's arguments in favor of the bubble concept.
 
 
 26
 "(T)he goal of the Clean Air Act," as EPA admits in its brief, "is to enhance air quality and not merely to maintain it." Brief for EPA at 17 (emphasis added). See Clean Air Act § 101(b)(1), 42 U.S.C. § 1857(b)(1) (1970). Section 111's provisions mandating New Source Performance Standards were passed because Congress feared that the system of state plans designed to keep air pollution below nationally determined levels was insufficient by itself to achieve the goal of protecting and improving air quality.[25] The New Source Performance Standards are designed to enhance air quality by forcing all newly constructed or modified buildings, structures, facilities, or installations to employ pollution control systems that will limit emissions to the level "achievable through application of the best technological system of continuous emission reduction which * * * the Administrator determines has been adequately demonstrated." 42 U.S.C. § 1857c-6(a)(1) (1970), as amended, Pub.L.No. 95-95 § 109(c)(1), 91 Stat. 699-700.[26] The bubble concept in the challenged regulations would undercut Section 111 by allowing operators to avoid installing the best pollution control technology on an altered facility as long as the emissions from the entire plant do not increase. For example, under the bubble concept an operator who alters one of its facilities so that its emission of some pollutant increases might avoid application of the NSPS by simultaneously equipping other plant facilities with additional, but inferior, pollution control technology or merely reducing their production.[27] Applying the bubble concept thus postpones the time when the best technology must be employed and at best maintains the present level of emissions.
 
 
 27
 Moreover, the challenged regulations are internally inconsistent and create confusion by defining a stationary source one way (as an entire plant) when determining whether a "source" has been "modified," and another way (as an individual facility) when determining whether a "source" has been newly constructed or "reconstructed."[28] This inconsistency is apparently the result of a "compromise" between EPA's original regulations, which followed the Act in treating a single facility as a source, and the industry position presented by ASARCO that a source must be defined as an entire plant.[29] We are unable to understand why EPA should find it necessary to compromise by adopting a position that it admits is contrary to both the language and the basic purpose of the Act.[30]
 
 
 28
 EPA's main argument in support of its regulations is that its version of the bubble concept is necessary to provide flexibility in applying the NSPSs to modified facilities because the cost of bringing existing facilities into compliance with NSPSs is allegedly much greater than the cost of bringing new facilities into compliance.[31] This argument does not survive analysis. The record does not show that any version of the bubble concept is needed to provide flexibility to the operators of existing facilities. Under provisions of the regulations that are not challenged in this litigation, the operator of an existing facility can make any alterations he wishes in the facility without becoming subject to the NSPS as long as the level of emissions from the altered facility does not increase.[32] Thus the level of emissions before alterations take place, rather than the strict NSPS, effectively defines the standard that an altered facility must meet. The record does not indicate why more flexibility than this is necessary or even appropriate. Even if flexibility were a problem, the statute on its face allows for cost considerations to be taken into account in setting NSPSs, rather than in determining whether the standards will apply to whole plants or to individual facilities within those plants.[33]
 
 
 29
 Finally, the record indicates that the bubble concept has been supported by examples drawn from circumstances peculiar to the nonferrous smelting industry.[34] As EPA itself recognizes in its brief,[35] the proper place to consider the problems a particular industry will have in meeting the NSPSs is in proceedings dealing with the standards for that particular industry, not in regulations setting standards for all industries.[36]
 
 
 30
 We therefore agree with the Sierra Club that EPA's regulations incorporating the bubble concept are inconsistent with the language and purpose of the statute and cannot be justified by any alleged need for flexibility.
 
 C. ASARCO's Challenge to the Regulations
 
 31
 The dispute between ASARCO and EPA centers on how far the bubble concept should extend. ASARCO asserts that a stationary source must be defined as an entire plant for all purposes and that the NSPSs should therefore never apply to an existing plant, even if new facilities are built or old ones are "reconstructed," unless the net emissions of some pollutant from the entire plant increase.[37] ASARCO argues that the inconsistency in EPA's present definition of a stationary source[38] an inconsistency created by EPA's partial concessions to ASARCO's position should be resolved[39] by doing away with all limitations on the bubble concept. Brief for petitioner ASARCO at 18-23.
 
 
 32
 Since we find that any version of the bubble concept is incompatible with the language of the Act and contrary to its purpose, ASARCO's position is clearly untenable.[40] Our holding therefore resolves the inconsistency in the challenged regulations by eliminating its source: the bubble concept.
 
 
 33
 Accordingly, we remand to the EPA for further proceedings not inconsistent with this opinion.
 
 
 34
 So ordered.
 
 LEVENTHAL, Circuit Judge, concurring:
 
 35
 I concur in Judge Wright's opinion for the court.
 
 
 36
 The flexibility of a concurring opinion[1] permits some observations on the flexibility that may be available to the agency.
 
 
 37
 Conditions in the nonferrous smelting industry apparently prompted the approach reflected in the challenged regulations. The cost of controlling pollution emitted by existing smelters is great. The industry has argued that more efficient pollution control can be achieved by reducing the pollutants emitted by other facilities in the smelting process (a less expensive undertaking) to compensate for any increase in pollution attributable to modified smelters. The agency's response has been to permit this tactic in the case of all modifications of existing facilities, but not in the case of newly constructed facilities (where the cost of building in appropriate pollution controls may be more modest).
 
 
 38
 As the majority opinion points out, the manner in which the statute defines the terms "new source" and "stationary source" does not provide leeway for the agency to assign different meanings to "stationary source" depending on whether construction or modification is in question.
 
 
 39
 However, the statute does not totally prohibit the agency from making appropriate distinctions based on the realistic differences between new construction and modification. While costs may not be considered in determining whether a facility will be subject to an NSPS, as the bubble concept would have done, they may be considered in determining the level at which a standard should be set, and how it should be formulated.
 
 
 40
 The statute permits the Administrator to "distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing (NSPS's)."[2] I believe the terms "classes" and "types" are broad enough to permit the Administrator to set more liberal standards for modified facilities than for newly constructed facilities that perform the same function, if he determines that such a distinction is appropriate in a given case. This approach permits custom tailoring, and thus stands in contrast to the challenged regulations.
 
 
 41
 The challenged regulations potentially immunize all modified facilities and, as Judge Wright points out, would contravene the policy that contemplated that modification would bring about improvements and would provide this escape without regard to the costliness of conforming to performance standards for a particular category of modified facilities. The record is devoid of support for the proposition that pollution control for modified facilities will always involve costs disproportionate to the resultant benefits. However, the flexibility to distinguish between classes of new sources may serve to authorize a differential in the standards applicable to new and modified equipment in those cases where warranted by cost differences and cost-benefit analysis. This approach would not permit the Administrator to immunize a modified facility (one type of new source) from regulation under a performance standard,[3] but would permit an alternative course that promotes the underlying statutory concept of progressively bringing all pollution sources within the constraint of performance standards.
 
 
 42
 MacKINNON, Circuit Judge, concurring in part and dissenting in part:
 
 
 43
 I dissent from the judgment of the court for two general reasons. Primarily, I feel that the Administrator is vested with authority under the terms of 42 U.S.C. § 1857c-6(b)(1)(B) directing him to "establish Federal standards of performance for new sources" and 42 U.S.C. § 1857c-6(b)(2) authorizing him to distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards" to promulgate regulations effectively exempting certain "modified" stationary sources from the requirement of compliance with New Source Performance Standards (NSPSs). The court's opinion does not adequately consider the possibility, suggested by Judge Leventhal's concurrence but not taken to its logical conclusion there, that in stating that certain modifications will not be subject to NSPSs, the Administrator is in fact promulgating an NSPS concededly a somewhat unusual one but nevertheless one fully within the Administrator's discretion to establish for these sources. No reason has been advanced why the "standards" that the EPA is directed to promulgated cannot in certain cases be standards of nonregulation or simply of prior emission levels, and this is all that the Agency has in effect attempted to do in this case.
 
 
 44
 * I agree with Judge Leventhal that the Administrator could promulgate different NSPSs for modified as opposed to reconstructed or new stationary sources, but I cannot see why Judge Leventhal while conceding that the Administrator has the authority to set such different standards refuses to accept that the Agency can, in "distinguishing among classes, types and sizes, within categories of new sources," establish as NSPSs that certain sources need not conform to any new standards. If the Administrator could set the NSPS so high for modified, as opposed to reconstructed or new, sources that the former would plausibly never violate such standards (or merely establish standards sufficiently different for modified as opposed to new or reconstructed sources that the former would be left significantly less regulated), why should the Agency be disabled from effectively exempting them from NSPSs altogether? Merely because the Administrator has phrased his different treatment for modified as opposed to new or reconstructed sources in terms of an exemption from a standard rather than in terms of a lesser standard we should not determine that he has exceeded his authority. To do so seems overly formalistic in the context of a statute in which there is abundant language confirming that Congress, recognizing the difficulty of balancing economic and ecological goals, had meant to extend generous authority for discretionary decisions to the EPA.
 
 
 45
 The court argues that regardless of what other authority Congress meant to grant the Agency to implement the Clean Air Act as the regulations embracing the bubble concept defined "facility" and "modification" in terms facially conflicting with those used in the statute itself, the Administrator exceeded his authority in promulgating such rules. I agree that the semantic route chosen by the EPA to effect a partial bubble concept was somewhat dubious, but I feel that the court has inadequately appreciated the background of broad administrative discretion against which the Act is set.
 
 
 46
 One need only peruse section 111 of the Act in order to become convinced of the broadness of the discretion with which Congress meant to clothe the Administrator in implementing that section. For example, in promulgating standards of performance for new stationary sources he has discretion (1) to "publish . . . (and . . . revise) a list of categories of stationary sources"; (2) to determine if a category of stationary sources "contributes significantly" to air pollution which causes or contributes to the endangerment of public health or welfare; (3) to "promulgate . . . such standards with such modifications as he deems appropriate . . . (and) from time to time, revise such standards . . . ." (Emphasis added). These grants of discretionary authority, when read in conjunction with the authority, referred to above, to distinguish between categories of new sources, point so clearly to a congressional intent to allow the Administrator a wide-ranging license to accommodate the environmental mandate of the Act with the exigencies of technology and economics that I am unwilling to accept the court's decision that the bubble concept lies outside the reach of his discretion.
 
 
 47
 The misguided literalism of the court's approach is perhaps better exposed by examining its effect on another regulation, more obviously legitimate than the bubble concept, promulgated by the Administrator. In 40 C.F.R. § 60.14(e)(1) "maintenance, repair, and replacement which the Administrator determines to be routine for a source category" are held not to be "modifications." Applying the same rigorous semantic technique that the court invokes in proscribing the bubble concept, however, one would be compelled to insist that 42 U.S.C. § 1857c-6(a)(4) defines modification to be "any physical change . . . which increases the amount of air pollutant emitted." (Emphasis added.) It is hard to see how the court could consistently reject the EPA's regulations embracing the bubble concept and not also reject its exemption of routine maintenance from the category of "modification" when the latter obviously involves a "physical change" and may increase pollution. It seems to me, however, incredible that Congress would have meant to dissuade manufacturers from repairing their equipment by the potentially harsh threat of being forced to comply with an NSPSs, or that this court would reject the EPA's recognized expertise in administering the Clean Air Act and invalidate 40 C.F.R. § 60.14(e)(1). If this court would do so, as its reasoning in this case suggests it would, I fear that it will go far toward preempting the discretion Congress plainly intended to allow the EPA in accommodating the various conflicting interests affected by the Clean Air Act.
 
 
 48
 In addition to the general grants of discretionary power to the Administrator under the Act, there is a persuasive concrete indication that Congress meant to invest the Administrator with discretion to promulgate the bubble concept, or something very much like it, in the contrast between the prohibitions on modifications under section 111 of the Act (42 U.S.C. § 1857c-6) with which we are here concerned and under section 112 (42 U.S.C. § 1857c-7) dealing with hazardous pollutants. Under section 111, it is only unlawful for "an owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source," 42 U.S.C. § 1857c-6(e) (emphasis added), i.e., in violation of the regulation promulgated by the Administrator which regulation might embrace the bubble concept. In sharp contrast to this relatively mild prohibition is the language of section 112(c) which specifically provides that "no person may . . . modify any existing source which, in the Administrator's judgment, will emit (a hazardous) air pollutant . . . in violation of (the national emission) standard (for that pollutant)." I agree that were we concerned here with hazardous air pollutants, the Administrator would have exceeded his authority had he promulgated a bubble concept. However, that Congress clearly knew how to proscribe this concept in section 112 and did not do so in section 111 seems to me to militate against the holding of the court. In my view of the statute Congress plainly intended, as one would expect they would, to treat modifications involving hazardous air pollutants more strictly than those involving non-hazardous ones, and yet the court seems willing to ignore the self-evident difference between section 111 and 112 because of a devotion to literalist statutory construction and the truism that the Act was meant not only to maintain, but to enhance air quality. Congress was manifestly aware of how to proscribe the bubble concept when it desired to do so. It did not do so in section 111, and neither should this court.
 
 II
 
 49
 My disagreement with the majority's proscription of the bubble concept is aggravated by a conviction that in many instances the Administrator has applied too narrow a meaning to the word "facilities" in promulgating his regulations governing emission standards. I doubt, although I need not reach the issue, that the Administrator could be said to have abused his expansive discretion in promulgating these regulations, but in my opinion the narrowness with which he particularized the concept of "facility" in the context of rules for various industries not only distorted legislative purpose but also accentuated the need for something like the bubble concept. The EPA's attempt to embrace the bubble concept was a laudable attempt to adjust its regulations to be more consistent with the true intent of Congress. It is this corrective effort that the court invalidates.
 
 
 50
 Congress defined a "stationary source" to mean "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 1857c-6(a)(3) (emphasis added). It did not define "facility," and specifically did not indicate that it intended a facility to mean anything that may emit any air pollutant. The EPA regulations do not define "facility" either. However, an "affected facility" (emphasis added) is defined in the regulations to mean "with reference to a stationary source, any apparatus to which a standard is applicable." 40 C.F.R. § 60.2(e). 40 C.F.R. § 60.2(aa) defining existing facility and the EPA's application of these terms in various concrete contexts seems similarly restrictive. The regulations demonstrate a distinct reluctance to refer to entire plants as single facilities. This was not an attitude shared by Congress, and certainly not one in accord with common usage. (Of course, if an entire plant is deemed a "facility," the bubble concept has in many cases been effectively embraced, as then, by the very statutory language on which the court's opinion relies, any of the plant's constituent parts could be modified although their particular emission level was increased so long as that of the plant in general remained constant).
 
 
 51
 In ascertaining the statutory meaning of the term "facility," it is important to note that Congress used the word in conjunction with "building, structure . . . (and) installation(s)." These terms, with which "facility" is grouped, all refer to conglomerate entities capable of housing a number of machines, pieces of equipment, etc. Even if the ordinary usage of the term did not persuade that Congress intended it to comprehend entire plants, or at least such large and independent devices as, for example, blast furnaces, the context in which "facility" is used in the statute would go far towards convincing us of this interpretation, and accordingly of the legislative sanction for the bubble concept.
 
 
 52
 Moreover, the common meaning of "facility" is such that Congress would have to have shown some affirmative desire to restrict this meaning to preclude "facility" encompassing, in some instances, whole plants. "Facility" does not have any precise meaning, nor is it a legal term of art; its meaning must be determined from common usage, see e.g., People ex rel. Schlaeger v. Bunge Bros. Coal Co., 392 Ill. 153, 64 N.E.2d 365 (1946); State ex rel. Knight v. Cave, 20 Mont. 468, 52 P. 200 (1898), and here in part from its statutory context. The common usage of the word is set forth in Webster's Third International Dictionary 812-813 (1961) which defines "facility" as "something (as a hospital, machinery, plumbing) that is built, constructed, installed or established to perform some particular function or to serve or facilitate some particular end." (Emphasis added.) A hospital seems an appropriate equivalent of a "plant," and "facility" is often used to refer to the latter, e.g., Falkner v. Northern States Power Co., 75 Wisc.2d 116, 248 N.W.2d 885, 901 (1977) (nuclear power station is a "facility"); Lincoln Bank & Trust Co. v. Exchange National Bank & Trust Co., Ardmore, Okla., 383 F.2d 694, 697 (10th Cir. 1967) (bank is "facility").
 
 
 53
 "Facility" does not refer to a small machine or piece of equipment, but only to those that are of sufficient magnitude and functional independence to perform a separable, integrated operation. For example, a taconite plant consists of a large grinding machine (one machine), the extracting operation (many machines), and the pelletizing operation (two coordinated machines). Collectively, the combination of these three operations constitute a facility, and if the three operations were housed separately each might be termed a facility, but it would not be in keeping with the meaning of the word as used in the statute to refer to each of the many machines in the pelletizing operation, as a "facility." In combination they are, separately they are not.
 
 
 54
 There is no indication that in drafting the Clean Air Act Congress intended to use "facility" as a term of art, more restricted in scope than it is in ordinary parlance; indeed, as mentioned above, the terms with which the Act groups "facilities" indicates quite the contrary. It should be noted, moreover, that the statute nowhere distinguishes facility and plant. All we can conclude from the phrasing of the Act is that Congress considered "building," "structure" and "installation" to have somewhat similar connotations but some differences from a "facility," and this alone is not at all suggestive that the legislature meant to treat individual machines as facilities or that it meant to distinguish facilities and plants.
 
 
 55
 The regulations, however, while they apply "facility" in its customary and statutory sense in certain places, e.g., Iron and Steel Plants (oxygen process furnace) § 60.140; Coal Preparation Plant, § 60.215(a); Asphalt Concrete Plant, § 60.90; Incinerators of stated consumption, § 60.50, also contain numerous instances where the "apparatus" the regulations sometimes refer to as a "facility" do not rise to the dimensions of a "facility" as that word is used in the statute. Under my interpretation of the regulations, there are numerous instances where the Administrator has referred to individual units of machines, equipment and apparatus as "facilities" where such equipment is not of sufficient size, quantity or capacity to constitute a "facility" as the statute uses that term.
 
 
 56
 For example, in portland cement factories, the following are deemed "facilities": kiln, clinker cooler, raw mill system, finish mill system, raw mill dryer, raw material storage, clinker storage, finished product storage, conveyor transfer points, bagging and bulk loading and unloading systems, 40 C.F.R. § 60.60 (1976); and in primary lead smelters, the following are deemed "facilities": sintering machine, sintering machine discharge end, blast furnace, dross reverberatory furnace, electric smelting furnace, and converter. 40 C.F.R. § 60.180 (1976). While some of these "facilities" e.g., the blast furnace in the primary lead smelters may indeed correspond to the statutory meaning of the term, the tendency to splinter functioning wholes into smaller "apparatuses" seems clear.
 
 
 57
 Because the Administrator often defines "facility" too narrowly for purposes of the regulations, the bubble concept serves a valuable corrective function. This concept places the restriction that no modifications increasing air pollution be made not on what the Administrator has established in the first instance to be a facility, but on a larger unit. Where it is this larger unit that more nearly approaches the statutory meaning of facility, the bubble concept has effectively served to bring the regulations more in line with the legislative intent. As I feel that Congress intended to deal, in most cases, with entire plants as facilities under section 111, the bubble concept although a more circuitous approach than simply revising the regulations establishing which apparatuses are "facilities" is not only within the Administrator's discretion, but also an accomplishment of congressional purpose.
 
 
 58
 The majority opinion, in sharp contrast to the analysis set forth above, appears to dismiss out of hand any suggestion that "facility" could refer to an entire plant:
 
 
 59
 Thus, the present regulations, instead of limiting the definition of "stationary source" to one "facility" as the statute does, make it cover "any one or combination of" facilities. The preamble to the new regulations makes it clear that the purpose of this change is to define a statutory source as an entire plant.
 
 
 60
 188 U.S.App.D.C. at pp. --- - ---, 578 F.2d at p. 324 (footnotes omitted). This overly narrow application of the term "facility" leads to an unwarranted antipathy to the bubble concept. Quite apart from the issue of the range or discretion granted the Administrator, because the majority opinion apparently sees facilities in terms of individual machines rather than integrated combinations thereof, it is forced to perceive the bubble concept as a perversion rather than a fulfillment of the legislative objectives. And because the majority opinion sees the concept as a distortion of the statute, it cannot be receptive to the argument that although it might have been more direct for the Administrator simply to re-promulgate his regulations applying the term "facilities" in various specific contexts, the Agency's adoption of the bubble concept was a realization, not a distortion, of the dictates of the Clean Air Act.
 
 
 61
 To summarize, in those cases where the bubble concept was only serving to offset the existing regulations' restrictive interpretation of "facility," promulgating the regulations embodying this concept was not only a matter within the Administrator's discretion, it was fully consonant with the terms of the statute. In those cases where the regulations' application of "facility" to particular industries is in accord with the usual and statutory meaning of the term, the bubble concept although it may in certain instances be somewhat at variance with the statutory language is within the broad discretion vested in the Administrator. In the latter cases the majority opinion significantly reduces the flexibility with which the Act was intended to be implemented; in the former cases, the opinion misapprehends the words of the statute.
 
 III
 
 62
 The court's failure to perceive the overnarrowness of its, and in some instances the Administrator's, interpretation of "facility"; and its apparent refusal to appreciate the extremely broad discretion with which the EPA was vested in order to reconcile the various vital and contradictory interests profoundly affected by the implementation of the Act in my opinion is due, at least in part, to the somewhat abstract terms in which the instant dispute was presented. Constitutional considerations aside, when courts attempt to adjudicate under such circumstances as we have here they operate, lacking the concreteness of a particularized dispute, in an informational vacuum. As a result, the tribunal is liable to err due to the necessity of evaluating the issues before it in the abstract rather than through the perspective gained from examining an actual instance in which the issues arise where the regulations are actually being applied.
 
 
 63
 While I do not feel that this case should be dismissed either for prematurity or lack of standing, Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), I do feel that it has many of the earmarks of cases that are disposed of on such grounds. The law of standing is proverbially confused, see, e.g., K. Davis, Administrative Law Text § 22.01 (3d ed. 1972); Scott, Standing in the Supreme Court A Functional Analysis, 86 Harv.L.Rev. 645, 645 n.1 (1973); Lewis, Constitutional Rights and the Misuse of "Standing," 14 Stan.L.Rev. 433, 434; Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423, 423 n.1 (1974), and recent Supreme Court cases seem to adopt virtually contradictory approaches towards it, compare Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) and Linda R. S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). At present, the law appears to be retreating from the generous standing doctrine of several years past, compare United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) and Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A "trifling or speculative" interest is no longer sufficient to admit the plaintiff to the courtroom, see Warth v. Seldin, supra; compare United States v. SCRAP, supra; Linda R. S. v. Richard D., supra; Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 211-212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). Current doctrine indicates that one who is regulated by a statute or regulation does not ipso facto have standing to challenge it, but rather "the law is that one who is regulated lacks standing unless he can show an interest that is adversely affected" (emphasis added), K. Davis, Administrative Law in the Seventies, Appendix 177 (1977). For example, in Warth v. Seldin, supra the latest major Supreme Court ruling on standing builders governed by an ordinance were denied standing even though they alleged that the statute prevented them from building the type of housing they desired, as were other low income plaintiffs who alleged that they desired to obtain such housing. In that case, the Court stated:
 
 
 64
 Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. . . . We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of "a real need to exercise the power of judicial review" or that relief can be framed "no (broader) than required by the precise facts to which the court's ruling would be applied."
 
 
 65
 422 U.S. at 502, 508, 95 S.Ct. at 2210.
 
 
 66
 The Sierra Club's interest in this case is very speculative. Allegation of injury to one's environment is sufficient to have standing, but there has as yet been no tangible injury to the environment. Cf. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and the possible deleterious effect of the EPA's accommodation of the industry's desire for the "bubble concept" are far from clear. Perhaps the flexibility which this concept would allow manufacturers in developing and installing new machinery now could in the future, when new means of pollution control are found, actually allow for quicker enhancement of air quality than would have been possible had the bubble concept been totally repudiated. If and when the Sierra Club can demonstrate a concrete injury, they may, of course, gain access to the courts, see Sierra Club v. Morton, 348 F.Supp. 219 (N.D.Cal.1972), but at this point there must be considerable doubt as to whether they are legitimate plaintiffs.
 
 
 67
 The question of standing naturally suggests the issue of ripeness, see K. Davis, Administrative Law Text § 22.01 (1958). It has long been clear that courts will not whether for constitutional or prudential reasons is a matter of some debate, see e.g., Berger, Standing to Sue in Public Actions: Is It a Constitutional Right, 79 Yale L.J. 816 (1969) adjudicate a "controversy" which has not become sufficiently concrete, see e.g., Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). Absent a particular application of a regulation, this court itself has held that the question was not ripe for adjudication, National Assoc. of Insurance Agents, Inc. v. Board of Governors of the Federal Reserve System, 160 U.S.App.D.C. 144, 489 F.2d 1268, 1271 (1974); cf. Alabama Assoc. of Insurance Agents v. Board of Governors of the Federal Reserve System, 533 F.2d 224 (5th Cir. 1976).
 
 
 68
 To the extent that this case presents the issue of whether agency regulations comply with the statute under which they have been promulgated, it poses a "purely legal" question that is ripe for decision. Abbott Laboratories v. Gardner, supra; Bethlehem Steel v. EPA, 536 F.2d 156 (7th Cir. 1976); National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971). This appeal, however, hinges in large part on the proper interpretation of "facility" as used in the statute, and the court in dealing with this issue is to some extent rendering a purely advisory opinion. Had the court been presented with a specific factory (or part thereof), plant, or other constructed unit and been asked to determine whether or not it was a "facility" within the meaning of the Act, it would have been operating within traditional judicial competence, but no such concrete example was presented. Our decision should await such a presentation. The case may not be premature in a formal sense, but the court has indirectly been asked to elucidate the meaning of statutory language and virtually to become a part of the rule-making process, without the benefit of a specific example. I venture to suggest that in this case the court has suffered exactly that "entangling (of) themselves in abstract disagreements over administrative policies" that the ripeness doctrine was meant to avoid, Abbott Laboratories v. Gardner, supra, 387 U.S. at 148, 87 S.Ct. 1507. If a concrete example of a "facility" had been actually involved in this case, the opinion might well have arrived at a different interpretation of the meaning of the term, and one which, in my view, would more closely approximate its meaning in commonsense and in the statute.
 
 
 69
 I respectfully dissent to the extent indicated above. As I feel that the Administrator was well within his discretion in applying the bubble concept only to modified and not to new or reconstructed facilities, however, I concur in the result although not in the rationale of the court's dismissal of ASARCO's argument that the inconsistency of the Administrator's position required extending the bubble concept to new and reconstructed sources as well as those that had merely been modified.
 
 
 
 [1]
 As a preliminary matter the petitioners in No. 76-1030, as intervenors in No. 76-1037, have made a motion, not joined by the EPA, that Sierra's petition be dismissed because Sierra did not participate in the informal rulemaking proceedings and because the points raised in Sierra's petition were allegedly not adequately presented by the parties that did participate
 In fact, the issue raised by Sierra's petition whether the "bubble concept" adopted by the new regulations (see --- U.S.App.D.C. at ---, 578 F.2d at 322 infra ) is consistent with the language of the Clean Air Act was a central issue in EPA's rulemaking proceedings to determine whether its existing regulations should be changed to accommodate the bubble concept. That issue was raised by those participating in the rulemaking proceedings, just as it is raised by Sierra and ASARCO in this litigation. See, e.g., Meeting Report: Meeting on Definition of Modification, EPA/Nonferrous Smelter Industry, Sims L. Roy, Jr. to Files, July 5, 1973, at 1, JA 8 (hereinafter cited as Meeting Report, July 5, 1973) ("EPA indicated that the legality of the proposed industry definition of modification (adopting the bubble concept) would be considered") (emphasis added); Public Comment Summary: Modification, Notification, Reconstruction, Revised April 1976, at 12-13, JA 110-111 (response to Comment 20). The final report to the EPA Administrator on the regulations noted that "(i)t appears that the most probable area of controversy which would result from the promulgation of this package will be the 'bubble concept' * * *." Rulemaking to Clarify the Modification Provisions of Section 111 of the Clean Air Act ACTION MEMORANDUM, Nov. 24, 1975, at 4, JA 97. The issue raised by Sierra was thus not only raised and considered in the proceedings below; it was a substantial part of the fundamental issue in those proceedings. See 40 Fed.Reg. 58416-58417 (1975), JA 99-100 (EPA's preamble to regulation discussing "Terminology" and "The 'Bubble Concept' "). We therefore find no merit in intervenors' motion to dismiss.
 Even if this point were not dispositive, other factors in this case would lead us to exercise our discretion to deny the motion to dismiss. See, e.g., NLRB v. Industrial Union of Marine & Shipbuilding Wkrs., 391 U.S. 418, 426 n.8, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); Hayes v. Secretary of Defense, 515 F.2d 668, 673-675 (1975); Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, 703 (1974); K. Davis, Administrative Law of the Seventies § 20.01 (1976). First, EPA itself did not move for dismissal on grounds of exhaustion or join in intervenors' motion. The agency's failure to insist upon exhaustion in this particular case suggests that, in EPA's view, the costs in terms of interfering with agency proceedings, creating an incentive to ignore agency processes in the future, and depriving the agency of a greater opportunity to apply its expertise or of a chance to "correct its own errors" do not outweigh the benefits of this court's immediate consideration of Sierra's petition. See K. Davis, Administrative Law of the Seventies § 20.00 (1977 Supp.); cf. Weinberger v. Salfi, 422 U.S. 749, 764-767, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Second, the issues raised by Sierra's petition are essentially issues of statutory interpretation, which depend primarily on the words of the statute and the relevant legislative history, rather than on a record of fact-finding developed by an agency with special expertise. See McKart v. United States, 395 U.S. 185, 197-199, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Third, since the petitions of ASARCO and Sierra raise essentially the same question whether the "bubble concept" regulations are consistent with the mandate of the Clean Air Act the interests of judicial efficiency are served by hearing and deciding these cases together.
 As a final consideration, we note that Congress has now amended § 307 of the Clean Air Act to require a form of exhaustion of administrative remedies as a prerequisite to judicial review under that section in the future. See Pub.L.No. 95-95 § 305(a), 91 Stat. 775 (1977) (adding § 307(d)(7)(B)). The amendments specifically provide, however, that this exhaustion requirement will apply only to rules proposed "after ninety days after the date of enactment" of the amendments, which were enacted on August 7, 1977. See Pub.L.No. 95-95 § 305(a), 91 Stat. 775-776 (adding § 307(d)(11)). This provision indicates that Congress wished exhaustion questions related to rules proposed before that date to be determined according to existing law.
 
 
 [2]
 40 Fed.Reg. 58416 (1975), JA 99, codified at 40 C.F.R. §§ 60.2(d), (h), (aa), (bb); 60.5; 60.7; 60.14; 60.15 (1976). The particular portions of these regulations being challenged are indicated in the discussion below
 
 
 [3]
 For an explanation of the "bubble concept" see 188 U.S.App.D.C. at ---, 578 F.2d at 322 infra
 
 
 [4]
 Pub.L.No. 91-604, 84 Stat. 1676 (1970)
 
 
 [5]
 If a state does not submit an adequate SIP within a specified time limit, EPA is authorized to design and implement its own plan. 42 U.S.C. § 1857c-5(c) (Supp. V 1975), as amended, Pub.L.No. 95-95 § 108(d), 91 Stat. 685, 694-695. Federal and state authorities are given joint powers to enforce the plans. See, e.g., 42 U.S.C. § 1857c-9 (1970 & Supp. V 1975), as amended, Pub.L.No. 95-95 § 113, 91 Stat. 709
 
 
 [6]
 The 1970 amendments provided that the NSPSs were to "reflect() the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction) the Administrator determines has been adequately demonstrated." Section 111(a)(1), 42 U.S.C. § 1857c-6(a)(1) (1970)
 This language was amended in 1977, but the new provisions still reflect a commitment to requiring the best technology. The NSPSs must now "reflect the degree of emission limitation and the percentage reduction achievable through the application of the best technological system of continuous emission reduction which (taking into consideration the cost of achieving such emission reduction, any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated." Pub.L.No. 95-95 § 109(c)(1)(A), 91 Stat. 699-700.
 
 
 [7]
 EPA is instructed to publish a list of categories of stationary sources and to issue regulations setting NSPSs for the sources within these categories. 42 U.S.C. § 1857c-6(b)(1) (1970 & Supp. V 1975), as amended, Pub.L.No. 95-95 §§ 109(c)(2), 109(c)(3), 91 Stat. 700-701. The 1977 amendments add provisions designed to expedite promulgation of NSPSs for all "major stationary sources." Pub.L.No. 95-95 § 109(a), 91 Stat. 697-699
 
 
 [8]
 The definition of "modification" in the regulations differed in several respects from the statutory definition. The regulations specified that "(r) outine maintenance, repair, and replacement" would not constitute "physical changes" and that "change(s) in the method of operation" would not include an increase in the production rate up to the "operating design capacity" of a facility, "(an) increase in the hours of operation," or "(u)se of an alternative fuel or raw material" that the facility was previously designed to accommodate. 40 C.F.R. § 60.2(h) (1975). These provisions have been slightly amplified and carried over into the new regulations, 40 C.F.R. § 60.14(e) (1976), but they are not challenged by the petitioners here. See br. for petitioner Sierra Club at 7 & n.4
 
 
 [9]
 An entire plant is an awkward unit to set standards for. Indeed, even under the new regulations EPA sets standards for facilities rather than entire plants. See, e.g., 40 C.F.R. §§ 60.2(d), 60.120-60.122 (1976). A single standard applies to an entire plant only when the plant contains a single facility. See, e.g., 40 C.F.R. § 60.90 (1976) (NSPS for asphalt concrete plants). Even ASARCO does not argue that EPA should set a single NSPS for an entire plant. See br. for petitioner ASARCO at 6-7; reply br. for ASARCO at 3-4. Yet the Act's direction that NSPSs are to be set "for sources " indicates that the units for which standards are set are sources. 42 U.S.C. § 1857c-6(b)(1)(B) (Supp. V 1975), as amended, Pub.L.No. 95-95 § 109(c)(2), 91 Stat. 700 (emphasis added)
 
 
 [10]
 See, e.g., letter from James M. Henderson of ASARCO to Donald F. Walters, then Chairman of the National Air Pollution Control Techniques Advisory Committee, Dec. 27, 1972, at 4 (incorporated by reference in letter from David W. Miller to Don R. Goodwin (EPA), Nov. 27, 1974, Doc. No. 35, at 3); telegram from Dept. of Commerce to Dr. Bernard Steigerwald (EPA), Mar. 3, 1973, Doc. No. 133, at 1; Meeting Report, July 5, 1973, supra note 1, JA 8; letter from George Wunder (Anaconda Co.) to Don R. Goodwin (EPA), Feb. 7, 1974, JA 12
 
 
 [11]
 See Minutes of Meeting: National Air Pollution Control Techniques Advisory Committee, May 21-22, 1974, Doc. No. 125, Appendix F (hereinafter cited as May Meeting Minutes); br. for petitioner Sierra Club at 10 & n.7
 
 
 [12]
 The draft regulations defined a single "stationary source" as containing a "combination of facilities." See May Meeting Minutes, supra note 11, Appendix F at 13. At this stage, however, a "combination of facilities" was not intended to refer to an entire plant. EPA intended to "limit() the scope of a combined emission system to a group of facilities whose emissions can be controlled by an existing common control system." Id. at 13. Furthermore, the combined emissions approach was to be applied only to "those facilities where a high-quality control system already exists and where substantial savings of control costs or energy could be achieved." Id
 
 
 [13]
 EPA's major objection to the bubble concept was that it would make emission standards extremely difficult to enforce. See, e.g., May Meeting Minutes, supra note 11, at 13; Draft Memorandum, "Proposed Rulemaking to Clarify the Modification Provisions of Section 111 of the Clean Air Act ACTION MEMO," July 12, 1974, Tab D at 2. The agency was also concerned that an approach based on maintaining existing levels of pollution would reward those operators who were presently using the fewest controls and use up air that would otherwise be available for new construction complying with NSPS. See, e.g., Minutes of Meeting: National Air Pollution Control Techniques Advisory Committee, Jan. 8-10, 1974, Doc. No. 130, at 7-8; Public Comment Summary, Revised April 1976, at 12-14, JA 110-112 (response to Comment 24)
 
 
 [14]
 See Proposed Rulemaking to Clarify the Modification Provisions of Section 111 of the Clean Air Act ACTION MEMO., with Tabs A, B, C, and D, Sept. 30, 1974, JA 45-62; 39 Fed.Reg. 36946-36950 (1974), JA 63-67
 
 
 [15]
 See letter from William C. Rountree, Assistant General Counsel, DOC, to Alvin L. Alm, Assistant Administrator for Planning and Management, EPA, Dec. 9, 1974, JA 91-93. The proposed regulations permitted emission increases from altered facilities to be offset only by emission decreases from other facilities of the type for which NSPSs were prescribed. This limitation was considered necessary for accurate measurement. It was dropped in the final regulations. See Rulemaking to Clarify the Modification Provisions of Section 111 of the Clean Air Act ACTION MEMORANDUM, Nov. 24, 1975, at 2, JA 95; 40 C.F.R. § 60.14(d) (1976)
 
 
 [16]
 40 Fed.Reg. 58416 (1975), JA 99
 
 
 [17]
 The EPA's definition of a "facility," which this court accepts, is "any apparatus to which a standard of performance is specifically applicable." See 188 U.S.App.D.C. at ---, 578 F.2d at 323 supra. This definition is clearly designed to designate as "facilities" those units of equipment be they individual machines, combinations of machines, or even entire plants that the agency finds to be appropriate units for separate emission standards. A cursory review of the EPA's regulations indicates that the units designated as "facilities" under this definition are usually larger than individual machines or single pieces of equipment, and are sometimes whole plants. See text and note at note 9 supra. In designating what will constitute a facility in each particular industrial context, EPA is guided by a reasoned application of the terms of the statute it is charged to enforce, not by an abstract "dictionary" definition. This court would not remove this appropriate exercise of the agency's discretion. See Union Electric Co. v. EPA, 427 U.S. 246, 256, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 43 L.Ed.2d 741 (1975); Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 541 F.2d 1, 12 n.16, 31 n.64 (en banc ), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976)
 
 
 [18]
 Generally speaking, "sources" are entire plants, while "facilities" are identifiable pieces of process equipment or individual components which when taken together would comprise a source. * * *
 
 
 [40]
 Fed.Reg. 58416 (1975), JA 99
 
 
 [19]
 A modification shall not be deemed to occur if an existing facility undergoes a physical or operational change where the owner or operator demonstrates to the Administrator's satisfaction * * * that the total emission rate of any pollutant has not increased from all facilities within the stationary source to which appropriate reference, equivalent, or alternative methods * * * can be applied. An owner or operator may completely and permanently close any facility within a stationary source to prevent an increase in the total emission rate regardless of whether such reference, equivalent or alternative method can be applied, if the decrease in emission rate from such closure can be adequately determined by any of the procedures prescribed under paragraph (b) of this section. The owner or operator of the source shall have the burden of demonstrating compliance with this section
 
 
 [40]
 C.F.R. § 60.14(d) (1976)
 
 
 [20]
 See, e.g., Comments of American Smelting & Refining Co., Newmont Mining Corp., and Magma Copper Co. on Proposed Rules, Nov. 27, 1974, at 42-50, JA 79-87
 
 
 [21]
 See Union Electric Co. v. EPA, supra note 17, 427 U.S. at 256, 96 S.Ct. 2518; Train v. Natural Resources Defense Council, Inc., supra note 17, 421 U.S. at 75, 87, 95 S.Ct. 1470; Ethyl Corp. v. EPA, supra note 17, 176 U.S.App.D.C. 373, 541 F.2d at 12 n.16, 31 n.64
 
 
 [22]
 See, e.g., id., 421 U.S. at 75-98, 95 S.Ct. 1470; Union Electric Co. v. EPA, supra note 17, 427 U.S. at 256-266, 96 S.Ct. 2518; Ethyl Corp. v. EPA, supra note 17, 541 F.2d at 11-33
 
 
 [23]
 See text and note at note 19 supra
 
 
 [24]
 The Act's definition of a "stationary source" as "any building, structure, facility, or installation which emits or may emit any air pollutant" is a broad and comprehensive one that cannot be reconciled with the regulations' restrictive definition of a source as an entire plant. In its briefs as intervenor and petitioner ASARCO attempts to justify the definition of a stationary source as an entire plant by pointing to passages in the legislative history that contain lists of the types of polluters Congress sought to regulate: e. g., "refineries, steel mills, primary smelting plants * * *." S.Rep.No. 91-1196, 91st Cong., 2d Sess. 16, in Senate Comm. on Pub. Works, 91st Cong., 2d Sess., 1 Legislative History of the Clean Air Act Amendments of 1970, at 416 (Comm.Print 1974) (hereinafter cited as Legislative History); "power plants, steel mills, and cement plants * * *." 116 Cong.Rec. 42384 (1970) (remarks of Sen. Muskie), in 1 Legislative History at 130. Br. for petitioner ASARCO at 22. EPA itself, however, points out that the legislative history contains lists mentioning "numerous other terms which refer to operations rather than entire plants as physical entities." Br. for EPA at 14 & n.12. Sierra argues further that these lists were not intended to be exclusive, that these larger "sources" are in fact regulated when their components are regulated, and that the Senators mentioned whole plants as sources because they lacked the familiarity with various industries to mention smaller units. Br. for amicus curiae Sierra Club at 16-17. We find the legislative history on this point a much less reliable guide than the words of the statute itself
 EPA attempts to base its "discretion" to redefine the term "stationary source" on § 111(b)(2), 42 U.S.C. § 1857c-6(b)(2) (1970):
 The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing (New Source Performance) standards.
 This language on its face merely allows the Administrator to set different standards for different classes, types, and sizes of sources. It does not give the Administrator authority to rewrite the definition of a stationary source, or to use different and inconsistent definitions when considering modification and new construction.
 Finally, EPA claims that § 111 is aimed primarily at new construction, br. for EPA at 19-20, and candidly admits that it intended "to develop a modification regulation * * * which minimizes that impact on existing sources." May Meeting Minutes, supra note 11, at 11. The Act's language, however, is aimed at new sources, not just new construction, and defines existing sources that are altered so that their emissions increase as new sources.
 
 
 [25]
 For example, the National Ambient Air Quality Standards will not encourage a state to adopt measures to improve air quality unless existing air pollution in the state is above the national limits. Congress feared that states with presently low levels of pollution would have an incentive to adopt lenient State Implementation Plans to attract industry until pollution reached the national limits. "Forum shopping" by industry on the basis of the leniency of SIPs would then cause all air to deteriorate to the minimum quality set by the national standards. See, e. g., 116 Cong.Rec. 32902 (1970) (remarks of Sen. Muskie) in 1 Legislative History, supra note 24, at 227. Congress was also concerned that the pollution limits would have an adverse effect on industrial growth since no new plants could be built if existing industry was already polluting up to the national limits. See, e. g., S.Rep.No. 1196, 91st Cong., 2d Sess. 17 (1970), in 1 Legislative History, supra note 24, at 417
 
 
 [26]
 See, e. g., S.Rep.No. 91-1196, 91st Cong., 2d Sess. 15-17 (1970), in 1 Legislative History, supra note 24, at 415-417:
 The provisions for new source performance standards are designed to insure that new stationary sources are designed, built, equipped, operated, and maintained so as to reduce emissions to a minimum. * * * The maximum use of available means of preventing and controlling air pollution is essential to the elimination of new pollution problems while cleaning up existing sources.
 Standards of performance should provide an incentive for industries to work toward constant improvement in techniques for preventing and controlling emissions from stationary sources, since more effective emission control will provide greater latitude in the selection of sites for new facilities. * * *
 
 
 [27]
 See 40 C.F.R. § 60.14(d) (1976)
 
 
 [28]
 See 188 U.S.App.D.C. at ---, 578 F.2d at 324-325 supra
 
 
 [29]
 See, e. g., Rulemaking to Clarify the Modification Provisions of Section 111 of the Clean Air Act ACTION MEMORANDUM, Nov. 24, 1975, at 2, JA 95 (regulations described as a "compromise" between consistently treating entire plants as single sources and rejecting the bubble concept)
 
 
 [30]
 See id. (the only reason given for not rejecting the bubble concept entirely is that this "would meet strong opposition from the smelter industry and the Department of Commerce"). In its brief EPA makes convincing arguments against adopting ASARCO's version of the "bubble concept." See br. for EPA at 24-38. The agency fails to explain adequately, however, why the same arguments do not undercut its own version of the bubble concept
 
 
 [31]
 See br. for EPA at 18-21. EPA also claims that its regulation on "reconstruction," 40 C.F.R. § 60.15 (1976), supports the reasonableness of the modified bubble concept by protecting against possible abuses. Br. for EPA at 21-22. We note that the absence of any provision in these regulations for aggregating expenditures on existing equipment over the years creates a troublesome loophole in this "protection." See reply br. for petitioner Sierra Club at 13-15. Furthermore, though these regulations make EPA's version of the bubble concept less damaging to the purposes of the Act, they do not explain why the concept in any form is a reasonable approach under the statute
 
 
 [32]
 See 40 C.F.R. §§ 60.2(h), 60.14(a) (1976); 39 Fed.Reg. 36946 (1974); Proposed Rulemaking to Clarify the Modification Provisions of Section 111 of the Clean Air Act ACTION MEMO., Sept. 30, 1974, Tab A, at 3-4, JA 51-52 (explains EPA decision to determine whether an increase in emissions has taken place by measuring actual rather than potential precontrolled emissions); Public Comment Summary; Modification, Notification, Reconstruction, Revised April 1976, at 11, JA 109 (response to Comment 20). Since these regulations are not challenged here, we express no opinion on their validity
 
 
 [33]
 See 42 U.S.C. § 1857c-6(a)(1) (1970), as amended, Pub.L.No. 95-95 § 109(c)(1)(A), 91 Stat. 699-700, quoted at note 6 supra
 
 
 [34]
 Rulemaking to Clarify the Modification Provisions of Section 111 of the Clean Air Act ACTION MEMORANDUM, Nov. 24, 1975, at 1, JA 94
 
 
 [35]
 Br. for EPA at 33-34
 
 
 [36]
 The effect of our decision is thus to require the parties to re-address their concerns in proceedings more appropriate for considering concrete applications of the Act's provisions as properly interpreted. The industry petitioners in this action have already filed a petition to review the regulations setting NSPSs for the nonferrous smelting industry. See ASARCO, Inc., Newmont Mining Corp. and Magma Copper Co. v. EPA, D.C.Cir. No. 76-1093, filed Jan. 29, 1976
 
 
 [37]
 Br. for petitioner ASARCO at 23-31
 
 
 [38]
 See 188 U.S.App.D.C. at ---, 578 F.2d at 327-328
 
 
 [39]
 ASARCO's position itself is not consistent. If an entire plant were consistently defined as a single stationary source, the whole plant would become subject to NSPSs whenever any alterations in the plant, e. g., addition of a new facility, caused a net increase in the emission of any pollutant from the plant. Yet ASARCO supports EPA's regulation that prevents this result. See 40 C.F.R. § 60.14(c) (1976); reply br. for petitioner ASARCO at 3-4
 
 
 [40]
 ASARCO claims that adopting its proposal could lead in some instances to preventing short-term increases in pollution that would not be prevented if a "source" is defined as a single facility. See br. for petitioner ASARCO at 14-17. Essentially, the argument is that under the bubble concept an operator will have an incentive to keep plant emissions constant, while without the bubble concept emissions would increase at least by some amount whenever a new facility is added to the plant. EPA responds that the argument is based on special conditions present in the smelting industry and that in any event adopting ASARCO's proposal would "significantly increase emissions over the long-term and reward existing sites that have the highest pollution levels." Br. for EPA at 34
 Indeed, the consequences that would follow if ASARCO's position were adopted indicate the dangers inherent in accepting any version of the bubble concept. Treating whole plants as single sources would grant the operators of existing plants permanent easements against federal new source standards and the worst polluters would get the largest easements. The "best" pollution control technology would never have to be installed, and existing plants would use up much of the available clean air, inhibiting construction of new plants (which would comply with the NSPSs). As EPA explained:
 If the bubble concept were extended to cover new construction, large sources of air pollution could avoid the application of new source performance standards indefinitely. Such sources could continually replace obsolete or worn out facilities with new facilities of the same type. If the same emission controls were adopted, no overall emission increase would result. In this manner, the source could continue indefinitely without ever being required to upgrade air pollution control systems to meet standards of performance for new facilities. * * *
 
 
 [40]
 Fed.Reg. 58416, 58417 (1975), JA 99, 100. Unfortunately, these fears did not deter EPA from adopting regulations that would cause the same problem on a lesser scale
 
 
 [1]
 United States v. Ammidown, 162 U.S.App.D.C. 28, at 38, 497 F.2d 615, 625 (1973) (concurring opinion of Leventhal, J.)
 
 
 [2]
 42 U.S.C. § 1857c-6(b)(2)
 
 
 [3]
 The statute requires the Administrator to promulgate standards of performance for all new sources that he determines may contribute to air pollution