**HARLEY–DAVIDSON MOTOR COMPANY, INC., Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Russell E. Train, Administrator, Respondents.**

**No. 77–1104.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1978.

Decided March 9, 1979.

Joseph R. Austin, Los Angeles, Cal., for petitioner.

Lawrence B. Novey, Atty., E. P. A., Office of Gen. Counsel, Washington, D.C., with whom Joan Z. Bernstein, Gen. Counsel, E. P. A., and James W. Moorman, Asst. Atty. Gen., Washington, D. C., were on the brief, for respondents.

Thomas A. Pursley, III, Washington, D. C., entered an appearance for respondent, E. P. A.

Before BAZELON and MacKINNON, Circuit Judges and AUBREY E. ROBIN-SON, Jr.,* United States District Court Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge BAZELON.

BAZELON, Circuit Judge:

Harley-Davidson Motor Company, Inc. (Harley-Davidson) petitions for review of the Emissions Regulations for 1978 and Later Motorcycles (the Regulations), promulgated by the Administrator of the Environmental Protection Agency (EPA) on December 23, 1976.[1] These regulations establish for the first time maximum standards for emission of hydrocarbons and carbon monoxide from motorcycles. They apply to all motorcycles manufactured after December 31, 1977, and require that the motorcycles be guaranteed to meet the standards for their "useful life."[2]

Harley-Davidson's challenge is limited to EPA's definition of "useful life."[3] The

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The regulations were subsequently published in the Federal Register on January 5, 1977, 42 Fed.Reg. 1122, and have been codified as 40 C.F.R. Part 36, Subparts E and F (1977). They continue in effect under the Clean Air Act Amendments of 1977, Pub.L. No. 95–95, 91 Stat. 685 (1977), which were enacted on August 7, 1977. Section 406 of the Amendments provides that all "regulations" issued pursuant to the Clean Air Act and "in effect immediately prior to the date of enactment of [the Amendments] shall continue in full force and effect . . . ." Petitioner moved to stay application of the regulations pending determination of this action. Its motion was denied on December 16, 1977. Accordingly, all motorcycles built on or after January 1, 1978 became subject to the regulations. See 40 C.F.R. § 86.401–78(a) (1977).

Our scope of review is limited by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(D) (1976). See also ASARCO Inc. v. Environmental Protection Agency, 188 U.S.App.D.C. 77, 83–84, 578 F.2d 319, 325–26 (1978). The more specific requirements for review of EPA regulations enacted by § 305(a) of the Clean Air Act Amendments of 1977, Pub.L. No. 95–95, 91 Stat. 772–76 (1977) (adding § 307(d) ) (to be codified as 42 U.S.C. § 7607(d) ) are inapplicable. The requirements specifically apply only to rules proposed "after ninety days after the date of enactment" of the Clean Air Act Amendments of 1977, which were enacted on August 7, 1977. See Pub.L. No.95–95 § 305(a), 91 Stat. 775–76 (adding § 307(d)(11) ) (to be codified as 42 U.S.C. § 7607(d)(11) ).

2. See 50 C.F.R. § 86.401–78 (1977) and 42 U.S.C. § 1857f–1(a)(1) (1976) (to be recodified as 42 U.S.C. § 7521(a)(1) ).

3. This challenge does not involve EPA's authority to regulate motorcycle emissions nor the agency's basic emissions standards and certification procedures. Petitioner's Brief (P.Br.) at

regulations define "useful life" in terms of the average distance a motorcycle is expected to travel during its lifetime.[4] Harley-Davidson contends that this definition is impermissible under the Clean Air Act, unsupported by the rulemaking record, and unsound public policy. We conclude that none of the petitioner's contentions are meritorious, and, accordingly, deny its petition.

## I.

## EPA'S AUTHORITY UNDER THE CLEAN AIR ACT

Section 202(d) of the Clean Air Act directs EPA to "prescribe regulations under which the useful life of vehicles and engines shall be determined . . . ."[5] When Congress recently added subsection (3) to section 202(d), it expressly delegated to EPA responsibility for defining the "useful life" of motorcycles.[6] Subsection (3) provides that in the case of motorcycles "useful life shall . . . be a period of use the Administrator [of EPA] shall determine."[7]

▮ Notwithstanding Congress' grant of discretion to EPA, Harley-Davidson contends that the agency must define a useful life for motorcycles equal to one-half of their actual on-the-road life.[8] This is the approach that petitioner claims Congress used when it fixed the useful life of automobiles at five years or 50,000 miles in the Clean Air Act of 1970.[9] In Harley-Davidson's view, Congress tacitly carried this approach over into the 1977 amendment to section 202(d) of the Clean Air Act.

The legislative history of section 202(d) is contrary to Harley-Davidson's claim. The Senate Report explains that the approach used in the 1970 Clean Air Act, while "reasonable" for automobiles and trucks, "is clearly inadequate for motorcycles."[10] The Report also recognizes that, although motorcycles have a shorter road life than automobiles and trucks, they constitute a serious source of pollution "requir[ing] effective controls."[11] The Report therefore concludes that EPA should be given flexibility "to establish a reasonable mileage standard for motorcycles . . . based upon [EPA's] judgment of what is reasonable."[12] The House Conference Report accepted the Senate's decision to leave to EPA the definition of "useful life" for motorcycles.[13]

Harley-Davidson also argues that whatever discretion EPA may have in defining "useful life," it cannot establish more stringent emissions regulations for motorcycles than those for automobiles. Congress, however, has not required EPA to set comparable emissions standards for motorcycles and automobiles. EPA's mandate is to prescribe emissions regulations for motor vehicles whenever such vehicles contribute to air pollution that endangers the public

---

3. Moreover, the petitioner acknowledges as moot its contention that the regulations should take effect as of date of sale and not as of date of manufacture. Petitioner's Reply Brief (P.R. Br.) at 2.

4. The regulations divide motorcycles into three categories based on engine displacement. 40 C.F.R. § 86.419–78 (1977). "Useful life" is defined as five years or 12,000 kilometers for 50–169 cubic centimetre engines, 18,000 kilometers for 170–279 cubic centimetre engines, and 30,000 kilometers for engines 280 cubic centimetres or greater, whichever occurs first. 40 C.F.R. § 86.402–78 (1977).

5. 42 U.S.C. § 1857f–1(d) (1976) (to be recodified as 42 U.S.C. § 7521(d)).

6. Pub.L. No. 95–95 § 224(g), 91 Stat. 769 (1977) (adding § 202(d)(3)) (to be codified as 42 U.S.C. § 7521(d)(3)).

7. *Id.*

8. P.Br. at 43–47.

9. *See* § 202(d)(1), (2), 42 U.S.C. § 1857f–1(d)(1), (2) (1976) (to be recodified as 42 U.S.C. § 7521(d)(1)(2)).

10. S.Rep.No.95–127, 95th Cong., 1st Sess. 77 (1977).

11. *Id.*

12. *Id.* at 78.

13. H.R.Rep.No.95–564, 95th Cong., 1st Sess. 164 (1977); U.S.Code Cong. & Admin.News 1977, p. 1077.

health or welfare.[14]  In devising the regulations at issue here, the record amply demonstrates that EPA fully considered alternative emissions control levels before electing "to obtain the maximum emission reduction which the technology allows, giving appropriate consideration to the cost of compliance."[15]  The agency's action comports with its statutory mandate.

When Congress enacted the Clean Air Act Amendments in 1977, it was aware that EPA already had promulgated motorcycle emissions regulations.  The Conference Report makes explicit reference to the motorcycle emissions standards that "the Administrator [of EPA] recently promulgated" and then endorses these regulations, stating:

> The conferees intend that EPA's promulgated approach is consistent with the authority granted in [section 202(d) of the Clean Air Act of 1970].[16]

This unequivocal statement demonstrates that Congress did not intend to constrain EPA in the fashion urged by the petitioner.  We conclude, therefore, that EPA acted within its statutory authority when it formulated the definition of "useful life."

## II.

## THE RULEMAKING RECORD

Harley-Davidson also contends that EPA's choice of definition for "useful life" is unsupported in the record and results in an unworkable public policy.  We consider these contentions mindful that where "a rational basis exists for the agency decision," the reviewing court must affirm so long as the agency decision was "based on a consideration of relevant factors."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

The rulemaking process extended over nearly a four year period.  EPA first alerted manufacturers that it was considering a definition of motorcycle useful life based on average distance travelled when the agency issued an Advance Notice of Proposed Rulemaking (Advance Notice) on January 17, 1974.[17]  Approximately twenty-one months later EPA published a Notice of Proposed Rulemaking (Notice) expressing its intention to define "useful life" in terms of "the average distance a motorcycle may be expected to travel in its lifetime."[18]  EPA extended the comment period to January

---

**14.**  *See* 42 U.S.C. § 1847f–1(a)(1) (1976) (to be recodified as 42 U.S.C. § 7521(a)(1) ).

**15.**  42 Fed.Reg. at 1123 (1977).  For example, EPA states that it considered promulgating *more stringent emissions standards for a shorter* useful life mileage.  The agency opted instead for a longer useful life mileage because that approach "ensures some degree of pollution control for a greater proportion of the population of motor[cycles] in use at any point in time  . . . ."  *Id.*  The agency also took into account the technology peculiar to the motorcycle industry in arriving at its approach to motorcycle emissions regulations, Petitioner's Appendix (P.A.) at 311, and the fact that "a shorter useful life with a tighter emission standard would be more likely to lead to gross emitters in the second half of a vehicle's life." 42 Fed.Reg. at 1123 (1977).

**16.**  H.R.Rep.No.95–564, *supra* note 13;  U.S. Code Cong. & Admin.News 1977, p. 1545.

**17.**  39 Fed.Reg. 2108 (1974).  The definition proposed in the Advance Notice divided motorcycles into two categories:  those motorcycles with engine displacement of 170 cubic centime-

tres or less and those with displacement greater than 170 cubic centimetres.  EPA proposed a useful life of five years or 20,000 kilometers for the former;  ten years or 50,000 kilometers for the latter.  The agency considered the definition of "useful life" to be a "key element" in the "development of test procedures for certification," since its preliminary findings indicated that motorcycle life differed significantly from that of passenger cars.  39 Fed.Reg. at 2110 (1974).  EPA also used the Advance Notice to solicit comments and supporting data on the effect the useful life definition would have on the agency's testing procedures.  *Id.*

**18.**  40 Fed.Reg. 49496, 49498 (1975).  EPA substantially revised its definition of "useful life" in the Notice.  The agency's revisions were in response to Advance Notice comments, a Gallup Motorcycle Survey, and motorcycle registration data.  The Notice proposed a useful life of 30,000 kilometers for motorcycles with engine displacements equal to or greater than 170 cubic centimeters and 12,000 kilometers for those with a displacement less than 170 cubic centimeters.  *Id.* at 49499.

30, 1976,[19] and, on June 23, 1976, held a special meeting with motorcycle manufacturers to discuss a near-final draft of the regulations.[20].

Throughout the rulemaking process, Harley-Davidson's principal objection to EPA's definition of "useful life" was that the definition created a "logical inconsistency in the certification process," rendering that process infeasible.[21] In its comments on EPA's Notice, Harley-Davidson urged that roughly half the vehicles involved in durability testing would break down before they accumulated the mileage necessary to complete the testing. This result, the petitioner contended, would make the certification process unworkable, unduly time-consuming, and costly.[22]

Our review of the record, however, reveals that EPA significantly modified the regulations to take into account the objections of Harley-Davidson and others to its proposed definition of "useful life." The final regulations promulgated by EPA accommodate Harley-Davidson's objections in at least three ways. First, the final regulations do not require every vehicle involved in the certification process to accumulate full lifetime mileage.[23] Durability test distances were reduced to *one-half* the distance the average motorcycle would travel during its useful life. EPA, in the preamble to the final regulations, notes that "[c]utting in half the test distance will reduce the lead time and cost required to accumulate test mileage . . . ."[24] Furthermore, the regulations provide that EPA may shorten the test distances contained in the definition if the objectives of the testing procedures are not thereby vitiated.[25]

Secondly, EPA's final regulations permit various types of scheduled, anticipated, and unscheduled maintenance to be performed on test vehicles.[26] These provisions further reduce the likelihood that test vehicles will be disqualified from the certification process.

Finally, the regulations provide that the manufacturer may, at its option, "elect to operate and test additional vehicles which are identical to those selected by the Administrator."[27]

■ These changes in EPA's testing procedures demonstrate that the agency seriously considered and took into account the objections of manufacturers such as the petitioner herein to its definition of "useful life." Where an agency demonstrates that a rational basis exists for its action, a court may not substitute its judgment for that of the agency. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. 814.

### III.

### EFFECT OF THE DEFINITION ON WARRANTIES

■ Harley-Davidson contended at oral argument that it would be technologically impossible under EPA's definition of "useful life" to determine warranty liability under Section 207(a) of the Clean Air Act[28]

---

19. 41 Fed.Reg. 2264 (1976).

20. Respondent's Brief (R.Br.) at 7.

21. *See,* for example, Respondent's Appendix (R.A.) at 54.

22. R.A. at 46–58.

23. *See* 40 C.F.R. §§ 86.426–78 and 86.427–78 (1977).

24. P.A. at 6.

25. 40 C.F.R. § 86.427–78 (1977).

26. *See* 40 C.F.R. §§ 86.428–78 to 86.429–78 (1977).

27. 40 C.F.R. § 86.421–78(c) (1977).

28. Section 207(a) of the Clean Air Act requires that manufacturers warrant "to the ultimate purchaser and each subsequent purchaser" that each new vehicle they produce is

> free from defects in materials and workmanship which cause such vehicle or engine *to fail to conform with applicable regulations* for its useful life. . . .

42 U.S.C. § 1857f–5a(a) (1976) (to be recodified as 42 U.S.C. § 7541(a)(1) (emphasis added).

since compliance with the emissions regulations would be achieved primarily through redesign of basic motorcycle components.[29]

However, nothing in the administrative record indicates that Harley-Davidson or any other participant in the rulemaking process objected to the regulations on this ground or presented evidence in support of such an objection. Thus, in the absence of anything more than petitioner's assertions at oral argument, we cannot conclude that the agency's "useful life" definition must be remanded because of the effect it allegedly will have on Section 207(a) warranty liability.[30]

For the reasons stated herein, the petition for review is denied.

The section 207(b) "performance" warranty is not at issue. The "performance" warranty requires implementing regulations before it becomes binding on manufacturers. *See* 42 U.S.C. § 1857f-5a(b) (1976) (to be recodified as 42 U.S.C. § 7541(a)(2) ). Since EPA has not yet adopted such regulations any implications which the useful life definition might have for this warranty are not before the court.

29. The warranty issues raised by the petitioner at oral argument differ from the warranty issue mentioned in petitioner's brief and reply brief. *See* P.Br. at 48; P.R.Br. at 11–12. In the briefs, petitioner contended that the five-year cutoff contained in the "useful life" definition is not the functional equivalent of the various distances at which warranty liability also terminates. As a consequence, petitioner claims that its warranty liability is subject to the user's whim.

EPA's research however indicates that a motorcycle *in typical use will reach the five-year time cutoff substantially before it attains the* mileage cutoff. P.A. at 308–17. Thus, the five-year cutoff actually operates as an upper limit which reduces manufacturers' warranty liability. EPA research also indicates that it is technologically feasible to expect motorcycle emission controls to remain durable for the motorcycle's total life since that lifetime is less than two-fifths that for which automobile manufacturers must design their emissions control systems. 42 Fed.Reg. at 1123–24 (1977).

30. Counsel for the petitioner suggested that the definition of useful life would create two problems for the manufacturer. First, counsel argued that EPA's definition would make the

manufacturer liable for all engine failures before the end of the motorcycle's useful life, since emission control was to be achieved through the design and adjustment of basic engine components. This problem is illusory, for, as counsel for EPA observed, the manufacturer only warrants that there are no defects that will cause the motorcycle *to exceed the emissions standards* during its "useful life." If the engine fails entirely (for whatever reason), it will not violate the emissions standards, and therefore will not subject the manufacturer to liability under the warranty.

Second, counsel contended that, when emission control is based on engine adjustment technology, it will be difficult to determine whether violations of emissions standards are due to defects in workmanship or materials, rather than, for example, owner misuse (which is not covered by the warranty). As a result, counsel for the petitioner argued that it will be extremely difficult to determine warranty liability. However, this problem is inherent in an "engine adjustment" strategy for controlling emissions, which all parties conceded was the only feasible approach to motorcycle emission control. *See, e. g.,* R.A. 20–22; P.A. 20–21, 65. The only effect of the EPA definition of useful life is to extend the period for which the manufacturer will be subject to this problem, an effect that EPA acknowledged in the preamble to the regulations. "[T]he longer the useful life, the more extensive will be the manufacturer's liability under the warranty provision . . . ." 42 Fed.Reg. at 1123 (1977).